UNITED STATES BANKRUPTCY COURT

MIDDLE DISTRICT OF LOUISIANA

In re

| | |
|---|---|
| RIVERSIDE HEALTHCARE, INC., | CASE NO. 04-11943 |
| HERITAGE OAKS HEALTHCARE, INC. | CASE NO. 04-11946 |
| Debtors | (JOINTLY ADMINISTERED) |

| | |
|---|---|
| THE LIQUIDATING SUPERVISOR FOR RIVERSIDE HEALTHCARE, INC. and HERITAGE OAKS HEALTHCARE, INC. | |
| Plaintiff | ADVERSARY NO. 05-1143 |
| v. | |
| SYSCO FOOD SERVICES OF SAN ANTONIO, LP | |
| Defendant | |

**MEMORANDUM OPINION**

   The Liquidating Supervisor for Riverside Healthcare, Inc. and Heritage Oaks Healthcare, Inc. ("Liquidating Supervisor"), by amending complaint filed February 6, 2007, sued Sysco Food Services of San Antonio, LP ("SSA") to avoid preferential transfers under 11 U.S.C. §547.[1] This is a core proceeding. 28 U.S.C. §157(b)(2)(F).[2]

   Riverside Healthcare, Inc. ("Riverside") and Heritage Oaks Healthcare, Inc. ("Heritage") filed chapter 11 on June 14, 2004. The court's May 23, 2005 order confirmed the debtors'

---

[1] Amended Complaint (P-61).

[2] This memorandum opinion comprises the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

chapter 11 plan of liquidation.[3] Article 6.7 of the confirmed plan[4] provided that Robert M. Hirsh, Esq. was to serve as the debtors' liquidating supervisor ("Liquidating Supervisor"). Plan article 6.8(h) gave the Liquidating Supervisor authority to pursue the debtors' and estates' causes of action.

## Applicable Law

The parties have stipulated that the only issue for trial is whether 11 U.S.C. §547(c)(2)[5] excepts from avoidance as transfers made in the ordinary course of business debtor Riverside's prepetition payments of $69,186.01 to SSA.

The ordinary course of business defense provides a safe haven for creditors who continue to conduct business with an entity that later files bankruptcy. "Without this defense, the moment that a debtor faced financial difficulties, creditors would have an incentive to discontinue all dealings with that debtor and refuse to extend new credit. Lacking credit, the debtor would face almost insurmountable odds in its attempt to make its way back from the edge of bankruptcy." *In re Gulf City Seafoods*, 296 F.3d 363, 367 (5th Cir. 2002).

SSA must prove that the payments in question were for debts incurred in the ordinary course of Riverside's business with SSA, that the payments were made in the debtor's ordinary course of business with SSA and that the payments were made according to ordinary business terms. 11 U.S.C. §547(c)(2).[6] The defendant must prove all three statutory elements of the

---

[3] Plan of Liquidation with Immaterial Modifications (P-190).

[4] May 23, 2005 Order Confirming Plan of Liquidation With Immaterial Modification Proposed by Debtors (P-266).

[5] Joint Pretrial Order (P-131) p. 10, ¶(i)(i) & (iii). The parties stipulated that the total sought gives SSA credit for $31,678.73 in new value SSA gave the debtor after the allegedly preferential transfers. Joint Pretrial Order (P-131) p. 10, ¶(i)(ii). *See* 11 U.S.C. §§547(c)(1) and (c)(4).

[6] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, made significant changes to the ordinary course of business defense to preference claims. *See* 11 U.S.C. §547(c)(2)(A)

defense by a preponderance of the evidence. 11 U.S.C. §547(g); *In re SGSM Acquisition Co., L.L.C.,* 439 F.3d 233, 239 (5th Cir. 2006).

The first element of the defense is not an issue because the parties do not dispute that the debts to SSA were incurred in the operation of Riverside's nursing home.

To meet its burden of proof on the second element, 11 U.S.C. §547(c)(2)(B), SSA must demonstrate that the debtor paid the debts in the ordinary course of the *parties'* business affairs. This is referred to as the "subjective" part of the ordinary course of business defense. *SGSM Acquisition Co.* at 239.

Finally, 11 U.S.C. §547(c)(2)(C) requires SSA to prove that Riverside paid it on ordinary business terms similar to those between other similarly situated debtors and creditors in the industry. *SGSM Acquisition Co.* at 239. This is an "objective" inquiry to determine "whether 'a particular arrangement is so out of line with what others do' that it cannot be said to have been made in the ordinary course." *Id.* at 239, *citing In re Gulf City Seafoods*, 296 F.3d 363, 368-9 (5th Cir. 2002). *See also In re Tolona Pizza Prods., Inc.*, 3 F.3d 1029, 1033 (7th Cir. 1993) ("only dealings so idiosyncratic" that they fall outside a broad range of payment practices in the particular industry are extraordinary and therefore outside the scope of section 547(c)). Thus, SSA must convince the court that "there exists some basis in the practices of the industry to authenticate the credit arrangement at issue" by producing "evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product." *Gulf City Seafoods, Inc.* at 369.

---

and (B). Those amendments do not apply to the Liquidating Supervisor's claims because the debtors' cases were both filed June 14, 2004, well before the act's October 17, 2005 effective date. Pub. L. 109-8, section 1501(b)(1).

**Facts**

Debtor Riverside operated a San Antonio, Texas nursing home known as Normandy Terrace Southeast ("Normandy Terrace").[7] SSA sells food and other products to nursing homes, schools, hospitals, restaurants and other institutions. SSA's trade area included San Antonio, and extended to Corpus Christi, Brownsville and Victoria, Texas. It supplied Riverside's facilities.

SSA's principal trial witness was Connie Howard, a senior SSA credit representative.[8] Ms. Howard began work at SSA in December 1995 and spent about two years in the customer service department before becoming a credit representative. Ms. Howard handled the Riverside account for SSA starting between 1998 and 2000, and was the only SSA credit representative dealing with Riverside for several years before trial.

Connie Howard testified that about half of SSA's customers were parties to distribution agreements, and the other half bought products from SSA on open account. The payment terms SSA offered its nursing home customers varied, according to Ms. Howard: SSA served some on a cash on delivery ("COD") basis, and offered others credit terms.

Riverside entered into a Master Distribution Agreement ("MDA I") with SSA on June 1, 1998.[9] MDA I required payment net sixty days: that is, Riverside was obligated to pay SSA

---

[7] Debtor Heritage also operated a Ballinger, Texas nursing home known as Heritage Oaks Estate. The evidence established that SSA sold products only to Normandy Terrace.

[8] SSA called two trial witnesses. The Liquidating Supervisor offered no live testimony, but submitted deposition testimony of William Olivier, SSA's Information Technology Supervisor, and Deborah Stevenson, an SSA account executive.

[9] June 1, 1998 Master Distribution Agreement (Exhibit Defendant 1).

within sixty days of product delivery.[10] The initial term of MDA I was from June 1, 1998 until May 31, 2000; however, the parties extended the agreement through May 31, 2002.[11]

Several nursing homes later formed a group, Nutrition Systems, Inc. (at some time renamed Foundation Health Services ("FHS")) to negotiate more favorable purchasing terms. The result of their efforts was a November 2003 Master Distribution Agreement ("MDA II") with Sysco Corporation.[12]

Despite the two written agreements, Ms. Howard consistently characterized SSA's relationship with Riverside as an open account, with Riverside's payments due within sixty days of product delivery.[13] She maintained that the net sixty days payment term never changed during the entire time she handled the Riverside account for SSA.

Riverside bought about $150,000 in food, beverages, chemicals and other products annually from SSA from 2002 through 2004.[14] Normandy Terrace ordered about $3000 in product from SSA every week,[15] and Riverside normally paid by check, often paying more than one invoice on each check.

---

[10] Exhibit Defendant 1, p. 5, ¶7.1.

[11] Exhibit Defendant 1, p. 6, ¶10.

[12] November 2003 Master Distribution Agreement (Exhibit Defendant 2). Nutrition Systems/FHS was a party to MDA II, but Riverside was not. Additionally, Schedule 1 of MDA II, which purports to list the locations participating in the agreement, is blank on the copy of MDA II admitted into evidence. Therefore, the applicability of MDA II to Riverside remains unproven.

[13] Connie Howard knew about MDA I and believed it remained in effect when the debtors filed chapter 11, until she learned of the existence of MDA II at her September 24, 2007 deposition. Though it apparently did not affect Ms. Howard's handling of Riverside's credit, unlike MDA I, the credit payment term of MDA II was net thirty days. Exhibit Defendant 2, p. 9, ¶9.1.

[14] Transcript of September 24, 2007 deposition of Deborah Stevenson, p. 23, l.19 through p. 24, l.16. Ms. Stevenson's duties included taking SSA customers' orders, then ensuring that SSA processed the orders promptly and delivered the products timely. Transcript of September 24, 2007 deposition of Deborah Stevenson, p. 17, ll.1 through 25.

[15] Transcript of September 24, 2007 deposition of Deborah Stevenson, p. 23, l.6 through p. 24, l.12.

Ms. Howard communicated by e-mail with Riverside's purchasing agent for all matters relating to payment on the Normandy Terrace account.  Although throughout the time that Ms. Howard supervised collection of SSA's nursing home accounts she routinely called customers whose accounts were delinquent, occasional e-mail exchanges were Ms. Howard's only communications with the debtor's purchasing agent concerning the account.[16]  Ms. Howard testified that she never called the nursing home about collection, and before the bankruptcy filing had never even telephoned the purchasing group to try to collect on the account.  Ms. Howard also testified that she had no idea of the nursing home's financial condition before its chapter 11, which she learned about from Riverside's financial director after the bankruptcy filing.  Before then, no one at SSA or at the purchasing group had told Howard that Riverside was having financial difficulties.  In fact, Howard identified only a single late charge SSA added to Riverside's account before Normandy Terrace filed chapter 11.  That late charge was incurred in July 2003, well before the start of the preference period.  Howard testified that the late charge was written off and not collected.

During the preference period Riverside did not materially change the frequency of its payments to SSA or the method it used to pay outstanding invoices, with one exception noted below.  SSA did not send Riverside demand letters, threaten to file lawsuits or exert other pressure to collect its invoices in the ninety days before the debtors filed chapter 11.  Nor did SSA change its twice weekly delivery of products to the nursing home.[17]

---

[16]  The "action notes" admitted into evidence as Exhibit Defendant 6 corroborate Ms. Howard's testimony.

[17]  The deposition testimony of Deborah Stevenson, the account executive who handled the debtors' account, corroborated that all Riverside's orders to SSA were handled without any difficulty associated with the debtors' finances.  Transcript of September 24, 2007 deposition of Deborah Stevenson, p. 26, l.20 through p. 27, l.2.

Mark Barofsky[18] testified on SSA's behalf concerning his analysis of the Liquidating Supervisor's preference claim.  Mr. Barofsky investigated payment terms offered by SSA's competitors in the San Antonio region, including Ben E. Keith, U.S. Food Service and National Food Group.  All the competing food service companies offered customers terms ranging from cash on delivery to payment within sixty days from the invoice date.  Those terms also were consistent with ordinary business terms in the food supply industry, according to Barofsky.

Mr. Barofsky also testified that the slight change in timing of Riverside's payments to SSA during the preference period was not a significant enough alteration in the parties' dealings to place them outside the ordinary course of their business.  Nor did Barofsky believe that the expiration of MDA I altered the dealings between the parties; he said that most businesses do not have similar detailed agreements, instead choosing to have their dealings governed by the customers' credit applications.

On cross-examination, Borofsky conceded that collection notes revealed that SSA had held Riverside's check number 34730 for $14,210.33 for five days before depositing it.  He opined that this could have been in the ordinary course of business depending on the parties' relationship.  However, no party offered evidence of any other instances in which SSA agreed to hold the debtor's check before depositing it.

---

[18] SSA never sought to have Barofsky qualified as an expert at trial, although SSA elicited extensive expert opinion testimony from him without any objection from the Liquidating Supervisor.  SSA's plan to tender Mr. Barofsky as an expert was disclosed in the Pretrial Order.  The Liquidating Supervisor had a copy of his report and deposed Barofsky before trial.  The Liquidating Supervisor has not argued that Barofsky's report was not delivered timely or was objectionable for any other reason, or that its case was prejudiced in any way by SSA's failing to qualify Barofsky as an expert.  *See* Fed. R. Bankr. P. 7026, incorporating Fed. R. Civ. P. 26(a)(2).  Despite SSA's oversight, the evidence supported the court's recognizing Mr. Barofsky as an expert on the credit industry under Federal Rule of Evidence 702, so his testimony is treated as expert testimony.

## Analysis

### 1. *With Only One Exception, Riverside's Payments to SSA During the Preference Period Were Made in the Ordinary Course of Business.*

The legislative history of the ordinary course of business exception to recovery under section 547 describes the exception's purpose as "to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S. Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5874. The evidence supports a finding that the financial dealings between SSA and Riverside during the preference period did not differ materially from their dealings before the period. Specifically, no material change occurred in the character or frequency of Riverside's payments to SSA during the 90 days before chapter 11 filing, with one exception.

The evidence did establish that SSA's one-time five-day hold on Riverside's check number 34730, for $14,210.33, was outside the parties' ordinary course of business. Given the course of dealing between the parties, that payment is not excepted from avoidance by 11 U.S.C. §547(c)(2), and the Liquidating Supervisor is entitled to judgment avoiding that payment. *See In re Computer Personalities Systems, Inc.*, 2004 WL 1607005 at *8 (Bankr. E.D. Pa. 2004) (absent history of parties' payments by post-dated check—analogous to holding a check—those payments were outside the ordinary course of business). *Compare In re T.B. Home Sewing Enterprises, Inc.*, 173 B.R. 790, 798 (Bankr. N.D. Ga. 1993) (where evidence showed that parties had practice of holding checks, holding check for payment was not outside the ordinary course of parties' business).

### 2. *SSA's Routine Deletion of Electronic Mail is Not Sanctionable.*

The Liquidating Supervisor contends that SSA's deletion from its servers of electronic mail messages relating to the SSA's dealings with the debtors supports an adverse inference and appropriate sanction based on SSA's destruction of relevant evidence.

The Fifth Circuit requires a showing of a litigant's bad faith to support an adverse inference on the ground that a litigant has destroyed relevant evidence. *Caparotta v. Entergy Corp.,* 168 F.3d 754, 756 (5th Cir. 1999), *citing Vick v. Texas Empl. Comm.*, 514 F.2d 734, 737 (5th Cir. 1975).

The United States District Court for the Middle District of Louisiana has ruled that in order to support an adverse inference (and by implication, a sanction) based on evidence spoliation, the party accused of destroying the evidence must have had control over the evidence, a duty to preserve it at the time it was destroyed, and must have acted with a "culpable state of mind."  The evidence also must have been relevant to a claim or a defense so that a reasonable trier of fact could find that it would support that claim or defense.  Finally, the party accused of destroying the evidence must be shown to have been in bad faith or to have engaged in bad conduct. *Consolidated Aluminum v. Alcoa,* 244 F.R.D. 335, 340 (M.D. La. 2006), *citing Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003), *Condrey v. SunTrust Bank of Georgia*, 431 F.3d 191 (5th Cir. 2005); *King v. Illinois Central R.R.*, 337 F.3d 550 (5th Cir. 2003); *U.S. v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000).  The *Consolidated Aluminum* court declined to conclude that the party accused of destroying evidence had the required intent where it routinely destroyed electronic mail and its employees had no legitimate business reason to retain the deleted e-mails. *See also generally Anadarko Petroleum Corp. v. Davis*, 2006 WL 3837518 at *27 (S.D. Tex. 2006).

The Liquidating Supervisor did not prove that SSA intentionally deleted or allowed the deletion of any electronic mail to frustrate the litigation. Rather, the evidence established that the electronic mail was deleted routinely before the Liquidating Supervisor sued SSA.

Connie Howard testified that SSA's computer system routinely deleted electronic mail after sixty to ninety days, absent a request to preserve the message. William Oliver, SSA's IT Supervisor and ranking information technology employee, testified that SSA's server retains *deleted* electronic mail for 14 days.[19] The Liquidating Supervisor did not join SSA as a party to the lawsuit until February 6, 2007. By then, electronic mail from before about October 24, 2006 had been routinely deleted from SSA's servers.

The Liquidating Supervisor also could not obtain electronic mail from Ms. Howard's work station. Ms. Howard testified that the hard drive of her computer failed and was replaced three times after Riverside's June 2004 bankruptcy filing. The Liquidating Supervisor's inability to retrieve information from Ms. Howard's computer under those circumstances was not the result of SSA's "fraudulent intent and a desire to suppress the truth." *Consolidated Aluminum v. Alcoa,* 244 F.R.D. 335, 343-4 (M.D. La. 2000).[20]

Additionally, to support imposition of sanctions the Liquidating Supervisor must demonstrate that the absence of the electronic mail unfairly prejudiced his case. *Stevenson v. Union Pacific R.R. Co.*, 354 F.3d 739, 748 (8th Cir. 2004). But the Liquidating Supervisor offered no evidence regarding his efforts to obtain electronic mail from FHS, Riverside's purchasing agent at all times material to the claims in the complaint. Ms. Howard testified that she had repeated contacts with Suzanne Booty at FHS concerning the Riverside account. Yet the

---

[19] Transcript of September 24, 2007 deposition of William A. Oliver, p. 14, ll.7 through 9.

[20] Moreover, Ms. Howard testified that everything in her electronic mail was reflected in her notes of contact with Riverside or "action notes," which were admitted into evidence as Exhibit Defendant 6**.**

Liquidating Supervisor did not depose Ms. Booty or call her as a witness. The plaintiff's failure to pursue evidence from FHS further undermines his claim to have suffered unfair prejudice and the demand for sanctions. *See Applied Telematics, Inc. v. Sprint Communications Co., L.P.*, 1996 WL 33405972 at *4 (E.D. Pa. 1996) (refusing to impose sanction of default judgment against defendant when plaintiff had failed to pursue other sources to obtain information defendant did not willfully or intentionally destroy).[21]

Finally, SSA invites the court to conclude that it had no duty to preserve electronic mail before February 6, 2007, the date of the Liquidating Supervisor's amended complaint naming SSA a defendant. That argument goes too far. *Consolidated Aluminum* and *Zubulake* specifically stand for the proposition that the duty to preserve electronic mail can arise even *before* a lawsuit is filed. *See Consolidated Aluminum* at 339 (duty to preserve evidence "arises when the party … should have known that the evidence may be relevant to future litigation"), citing *Zubulake*, 220 F.R.D. at 216. At that time a party must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents. *Id.*, citing *Zubulake*, 220 F.R.D. at 218.

The issue is when SSA should have realized that the electronic mail may have been relevant to the Liquidating Supervisor's complaint and SSA's defenses to it.

The Liquidating Supervisor argues that SSA should have known that it had a duty to preserve e-mails relating to the Riverside account after June 16, 2004, because counsel for SSA's parent, Sysco Corporation, had learned of Riverside's bankruptcy filing by then. However, no

---

[21] The 2006 amendment to Fed. R. Civ. P. 37, adopted by Fed. R. Bankr. P. 7037, added subsection 37(f) (renumbered in 2007 to 37(e)) which limits a court's ability to sanction where loss of information results from good faith operation of electronic information system.

evidence established the date on which Sysco representatives may have transmitted knowledge of Riverside's bankruptcy filing to SSA employees.

Accordingly, even assuming that SSA had a duty to preserve the electronic mail messages relating to the Normandy Terrace account, the Liquidating Supervisor failed to establish that SSA had a "culpable state of mind," *Consolidated Aluminum v. Alcoa,* 244 F.R.D. at 343, n.14 (M. D. La. 2000), much less acted in "bad faith" intentionally. *See Condrey, supra,* and cases cited at page 9, above.

## Conclusion

Sysco Food Services of San Antonio established that, with the exception of the payment of $14,210.33 made by check number 34730, all Riverside Healthcare Inc.'s transfers to SSA during the preference period were made in the ordinary course of business between the parties and according to ordinary business terms. However, because the transfer of $14,210.33 represented by check number 34730 was outside the ordinary course of business, it was preferential and will be avoided.

Finally, the evidence does not support a finding that SSA intentionally destroyed electronic mail relating to its dealings with the debtor. Absent that evidence, sanction for alleged spoliation is inappropriate.

Baton Rouge, Louisiana, September 11, 2008.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE